ST. LOUIS & ST. CHARLES BRIDGE COMPANY, a Corporation, Appellant, v. UNION ELECTRIC LIGHT & POWER COMPANY, a Corporation, Respondent.*

St. Louis Court of Appeals. Opinion Filed January 3, 1925.

1. **CONTRACTS: Indemnity Contract: Construction: Mutual and Interdependent Clauses: Injured Workman: Notice: Liability.** A provision of a contract between a bridge company and an electric light and power company, the latter maintaining on spans above the superstructure of the bridge, uninsulated wires carrying a high and dangerous voltage of electricity, whereby the electric company agreed to indemnify the bridge company against liability for injuries sustained by any person, by reason of the existence, construction or operation of the wires on said bridge, and a further

*(1) Indemnity, 31 C. J., section 40;

216 M. A.—25

provision whereby it was agreed that the electric company should have a representative in attendance during the painting, altering, or repairing of the bridge by the bridge company, for the purpose of securing the safety of the persons engaged in such work from injury by reason of the maintenance and operation of the wires on the bridge, *held* that the paragraphs of the contract were mutual and interdependent, and that the bridge company in undertaking to paint its bridge requiring its workmen to go upon the superstructure of the bridge amongst the uninsulated and dangerous wires, without notifying the electric company of its intention to do so, and affording it an opportunity to protect the workmen against the dangers thus incurred, violated an essential condition of the contract for indemnity, and such violation was a complete defense to a suit for indemnity for damages paid a workman for injuries sustained whilst painting the bridge.

2. **CORPORATIONS: Knowledge of Officers.** Knowledge which comes to an officer or agent of a corporation through his private transactions, and beyond the range of his duties as such officer or agent, is not notice to the corporation.

3. ———: ———: **Not Obtained in Official or Representative Capacity or Scope of Employment: Not Imputable to Corporation.** Knowledge obtained by the local manager of an electric company maintaining electric wires on plaintiff's bridge, concerning the painting of the bridge, through mere casual remarks of the plaintiff's president while the parties were engaged in the discussion of a business proposition relating to a matter having not the remotest connection with the respective rights and obligations of the plaintiff and defendant under the provisions of the contract relating to notice that the electric company should arrange to have a representative in attendance during the painting of the bridge, *held* the notice or knowledge which defendant's local manager thus obtained was not obtained in his official or representative capacity, nor within the scope of his authority, and was therefore not imputable to the corporation.

(2) Corporations, 14a C. J., section 2356; (3) Corporations, 14a C. J., section 2355.

Appeal from the Circuit Court of the City of St. Louis. —*Hon. J. Hugo Grimm*, Judge.

AFFIRMED.

*McDonald & Just* and *Frank B. Coleman* for appellant,

(1) Under the contract of October 26, 1917, respondent was absolutely obligated and bound to hold harmless and indemnify appellant from all damages resulting from the presence of respondent's wires on the bridge. Donovan v. Boeck, 217 Mo. 87; Blanke v. Surety Co., 247 S. W. 797. (2) If a contract is entire and indivisible, a breach of one condition will result in a discharge of all of the covenants, thus forfeiting all rights under other parts of the contract; and since contracts are always so construed as to prevent forfeiture, where possible, a provision which may tend to operate as a condition precedent, and hence as a forfeiture, will never be presumed and will be construed strictly. Page on Contracts, sec. 2589; Parsons on Contracts, sec. 526. (3) No precise and definite rule can be laid down for determining when a contract is entire and when severable. The true intention of the parties must govern. But where the question is a close one as to whether a given clause creates a condition precedent to the operation of another clause or is an independent and several covenant, the latter construction will prevail, because conditions precedent can never be presumed, since to do so would violate the well-established rule that the law never favors a forfeiture. 13 Corpus Juris, pp. 562-5; 2 Parsons on Contracts, secs. 526-7; Wooton v. Walters, 110 N. Car. 256; Bank v. Recknagel, 109 N. Y. 482; Bucksport v. Brewer, 67 Me. 295; Page on Contracts, secs. 2589-93; Williston on Contracts, sec. 807.

*Jourdan, Rassieur & Pierce* for respondent.

(1) The contract requires the Bridge Company to notify the Electric Company of its intention to paint the bridge, in order that the Electric Company might have an opportunity to take precautions for the safety of the workmen. Paragraph 8 of Contract; Opinion of the Trial Court, (2) The provision in the contract requiring notice to the Electric Company of the Bridge Company's intention to paint the bridge, was an essential condition

of the indemnity, and having failed to give such notice plaintiff is not entitled to recover. Fuller on Accident and Employers' Liability Insurance, pp. 570-476, and cases cited in notes; 22 Cyc. 102. (3)   The trial court correctly ruled as a matter of law that there was no evidence that the notice required by the contract had been given: (a)   Because knowledge acquired by an agent in his private capacity is not imputed to the corporation. C. J. 14-A, sec. 2356, pp. 488, 489; Kearney Bank v. Froman, 129 Mo. 427; Gregmoore Orchard Co. v. Gilmour, 159 Mo. App. 204; Benton v. Bank, 122 Mo. 332; Bank v. Lovitt, 114 Mo. 519; Johnston v. Shortridge, 93 Mo. 227; Frankfort M. A. & P. G. Ins. Co. v. Stevens, 220 Fed. 77. (b) Because where notice is required to be served upon a corporation it must be served upon an agent within the scope of his agency, and whose relation to the corporation is such as to make it his duty to communicate that information to the proper managing officer. 14-A C. J., sec. 2355, p. 487; Williams v. Dittenhoefer, 188 Mo. 134; Griffith v. Royal Arcanum, 182 Mo. App. 644; Elgin etc. Railway Co. v. U. S., 253 Fed. 907; Corrigan v. Bobbs-Merrill Co., 228 N. Y. 58; Heltzell v. Railroad, 77 Mo. 315; Opinion of the Trial Court, (4)   Even if plaintiff had complied with the condition in reference to notice (which it failed to do), still it is not entitled to recover in this action for the reason that the agreement sued on is a contract of indemnity, and an indemnitor is not liable to the indemnitee for the consequences of the indemnitee's own negligence. The only exceptions to this rule are where the indemnity agreement so provides in unequivocal language, or where it is executed by an insurance or indemnity company. Perry v. Payne, 217 Pa. 252; Heman Construction Co. v. City of St. Louis, 256 Mo. 332; Mitchell v. Southern Ry. Co. (Ky.), 74 S. W. 216; Manhattan Ry. Co. v. Cornell, 7 N. Y. S. 557, affirmed 130 N. Y. 637; Indianapolis etc. R. R. Co. v. Browenburg, 32 Ind. 199;

N. Amer. Ry. Cons. Co. v. Cinn. Tract. Co., 172 F. R. 214; Washington etc. Bridge Co. v. Penn Steel Co., 215 F. R. 32; Boston & Me. R. R. Co. v. Brackett, 71 N. Y. 494; St. L. & S. W. Ry. Co. v. Arnold, 32 Tex. Civ. App. 272; Morton v. Union Tract. Co., 20 Pa. Sup. Ct. 325; San Anton. etc. Ry. Co. v. Adams, 24 S. W. 839; Houston etc. Ry. Co. v. Diamond Press Brick Co., 188 S. W. 32; 5 Elliott on Contracts, sec. 4007. (5) The proximate and primary cause of the injuries to Robert Corder was the negligence of the Bridge Company. (6) There was no negligence on the part of defendant Union Electric Light and Power Company. 9 R. C. L., p. 1213; 1 Joyce on Electric Law, sec. 445, p. 737; Blackburn v. Railroad Co., 180 Mo. App. 548; Brubacker v. Electric Co., 130 Mo. App. 439; Luehrman v. Gas Co., 127 Mo. App. 213; Stack v. Telephone Co., 216 Mo. 601; Brush Elec. L. & P. Co. v. Lefeve, 49 L. R. A. 771. (7) On the whole record it appeared as a matter of law that plaintiff was not entitled to recover, and the court properly directed a verdict for the defendant.

SUTTON, C.—This action is upon contract. The contract sued on was made in 1917 between the plaintiff and the American Light and Power Company. In 1919 the contract was assigned by the American Light and Power Company to the defendant and thereupon defendant assumed all the obligations of the American Light and Power Company under the contract.

Plaintiff owns and operates a highway bridge across the Missouri River at St. Charles, Missouri, whereon it permits the public, upon the payment of tolls, to use the bridge in crossing the river. The defendant is a public utility corporation engaged in the generation and distribution of electricity for power, light, and heat. Its plant and general offices are located in the city of St. Louis. It distributes electricity to the city of St. Louis and outlying communities, including the city of St. Charles. It transmits its electric currents into the city

of St. Charles by means of six wires which it maintains on spans above the superstructure of the plaintiff's bridge. These wires are uninsulated and carry a high and dangerous voltage of electricity. The defendant's right to maintain its wires on plaintiff's bridge is derived under the contract sued on. At the time this contract was entered into the American Light and Power Company had already attached its wires to the plaintiff's bridge and was maintaining them thereon under a previous contract between the parties. Under the contract sued on plaintiff bridge company grants to the electric company the privileges of continuing the attachment and operation of its wires upon the plaintiff's bridge for the purpose of carrying currents of electricity across the Missouri River on said bridge for a term of twelve years, and the electric company agrees to pay for said privilege the sum of five hundred dollars per year during said term, said payments to be made each year in advance. There was also a provision in the contract whereby the electric company agreed to indemnify plaintiff against liability for injuries sustained by any person by reason of the existence, construction, or operation of the wires on said bridge. There was a further provision whereby it was agreed that the electric company should arrange to have a representative in attendance during the painting, altering or repairing of the bridge by the plaintiff, for the purpose of securing the safety of the persons engaged in such work from injury by reason of the maintenance and operation of the wires on the bridge. The proper interpretation of these provisions, which are embodied in the third and eighth paragraphs of the contract, constitutes the chief point involved upon this appeal, and such provisions will be hereafter fully set out.

A statement of the facts was agreed upon by the parties below, as follows:

"In order to dispense with proof as to matters concerning which there is no dispute, it is hereby stipulated and agreed by and between the parties hereto, by

their respective attorneys, that the following facts are admitted to be true, and that it shall not be necessary for either party to offer evidence at the trial in respect thereto. It is further stipulated and agreed that either party may, if it so desires, offer additional testimony as to facts not covered by this stipulation.

"Both plaintiff and defendant are corporations duly organized and existing under and by virtue of the laws of the State of Missouri, with offices in the City of St. Louis, Missouri.

"Plaintiff at all the times hereinafter mentioned owned, maintained and operated, and still owns, maintains and operates, a highway bridge across the Missouri River at St. Charles, Missouri; that on or about October 26, 1917, plaintiff entered into a written contract with the American Light and Power Company whereby permission was given to said American Light and Power Company to continue the attachment and operation of its electric wires to, upon and across said bridge upon certain terms and conditions therein set out. A true and correct copy of said contract is attached hereto and made a part hereof. On or about October 24, 1919, said contract was duly assigned by said American Light and Power Company to the defendant, and defendant thereupon and thereby assumed all the obligations of said American Light and Power Company thereunder.

"On or about June 14, 1921, one Robert Corder, being then and there in the employ of plaintiff and engaged as plaintiff's employee in painting said bridge at St. Charles, came in contact with an electric wire maintained on said bridge by defendant, which wire was then and there charged with a heavy voltage of electricity, and as a result of such contract said Robert Corder suffered serious injuries to his person, on account of which he made demand upon plaintiff and defendant for compensation and damages, and threatened to bring suit therefor against the plaintiff and defendant.

"Thereafter, to-wit, on November 17, 1921, it was agreed in writing between plaintiff and defendant that it was advisable to compromise said claim of said Corder in order to avoid litigation with him, since said compromise could then be effected, releasing both plaintiff and defendant, on payment to said Corder of $11,905, and it was by said contract further agreed that of said $11,905 plaintiff would contribute $5305 and defendant would contribute $6600, and plaintiff would then obtain from said Corder a release fully releasing both plaintiff and defendant, without thereby determining or affecting the rights and liabilities of plaintiff and defendant as between themselves in the premises. Thereafter defendant paid its said contribution of $6600 and plaintiff paid its said contribution of $5305, and thereupon said Corder's claim was fully settled and compromised, said settlement and said contributions and payments thereunder all being had and done under and by virtue of the terms of the aforesaid contract of November 17, 1921, which is hereto attached and made a part hereof.

"The said sum for which said Corder's claim was settled, to-wit, $11,905, was and is fair and reasonable and was paid under threat of suit against plaintiff and defendant, and if defendant is liable to plaintiff in any sum whatever it is liable in the amount of $5305.

"At the time said Robert Corder received his injuries as aforesaid he was engaged in the work of painting said bridge, and said Robert Corder was an employee of plaintiff, engaged in the work of painting said bridge under the direction and orders of plaintiff. Plaintiff had sole control of the painting of said bridge, and the manner of painting same, and the methods employed by the employees of plaintiff engaged in painting said bridge were solely under the control and direction of plaintiff. Plaintiff controlled the entire operation of painting said bridge, and furnished the tools, equipment and appliances used by said Corder and other employees

in the doing of said work. Defendant at no time had any control whatsoever over the painting of said bridge.

"No written notice was ever at any time given by plaintiff to the defendant that in plaintiff's opinion it was necessary to paint said bridge, nor of its intention to paint said bridge, nor that the work of painting said bridge was in progress."

The third and eighth paragraphs of the contract of October 26, 1917, are as follows:

"Third. The Electric Company hereby agrees to hold the Bridge Company harmless from any and all injuries to said Bridge Company on account of the placing of and maintaining said wires on said Bridge. It is also understood and agreed by the parties hereto that in the event anyone should sustain injury to his or her person or property by reason of the existence, construction or operation of said wires on said bridge that said Electric Company shall stand liable and pay all damages so sustained, provided such person be legally entitled to a recovery; and in the event suit be instituted against the Bridge Company on account thereof, said Electric Company shall, at its own expense, defend said suits and pay all damages, costs and expenses that may be levied, adjudged or assessed therein against the Bridge Company. And in the event notice of any such claim be filed or served upon the Bridge Company, or process in any such suit be served upon the bridge Company, the Bridge Company shall forthwith notify the Electric Company of such fact. In the event any person threaten to institute suit on account of the construction, maintenance or operation of said wires, and it shall be deemed best by both the parties hereto that compromise of such litigation be had, then said Electric Company agrees to pay the amount which may be agreed on in settlement. It is further agreed that the Electric Company shall pay all damages, if any, which said Bridge Company may sustain to the property on account of the construction, maintenance or operation of said wires, except such incidental damages, if any, as may be

sustained by the attachment of the wires. It being the intention of the parties to this agreement that the said Electric Company shall hold the Bridge Company free and harmless from any or all costs or damages of any kind or character whatsoever that may arise, directly or indirectly, by reason of the construction, attachment, maintenance or operation of said wires on said bridge.

"Eighth. It is necessary and may from time to time become necessary during the term of this contract for said Bridge Company to paint said bridge and add to, alter and repair the same, in which event, and when it becomes necessary for it to do so in the opinion of said Bridge Company, the said Electric Company in order to secure the safety of the persons making said repairs, additions, alterations or painting of said bridge shall, upon notice by the Bridge Company, arrange to have a representative in attendance during such repairing or construction for the purpose of instructing the workmen to maintain a safe distance between the wires and themselves, and the Electric Company, in the event the same becomes necessary, will at its own expense so adjust the wires on said bridge as to render the condition of the workmen of the Bridge Company reasonably safe from danger."

The contract of November 17, 1921, contained the following provision:

"Said Bridge Company shall enter suit in the Circuit Court of the City of St. Louis against the Union Electric to recover the sum advanced by it in settlement of Corder's claim, to-wit, five thousand three hundred and five dollars ($5305). The Union Electric agrees to enter its appearance to such suit and therein to admit that if it is liable to said Bridge Company in any sum whatever under said contract of October 26, 1917, it is liable for the full amount paid out by said Bridge Company in settlement of said claim, but the Union Electric reserves the right to contend in such action that it was not liable to said Corder in any sum whatever and that it is not liable to the Bridge Company in any sum under

the provisions of the said contract, and that it is not required to hold the said Bridge Company harmless from the said claim of Corder by reason of the circumstances causing said Corder's injuries and by reason of the nature and extent of said Union Electric's obligations under said contract of October 26, 1917, and by reason of said Bridge Company's failure to take proper precautions to prevent said injuries to Corder, and by reason of said Bridge Company's failure to notify said Union Electric or give it the opportunity to take steps to prevent such injury, and for any and all other reasons showing nonliability which may be urged by the Union Electric in such suit."

Corder was painting on the topmost girder of the bridge at the time he was injured. It had been raining the day before and the bridge was damp and wet. He described his experience thus:

"I painted until I got within about two strokes of having my part of the girder painted under those wires. I reached up and looked at the clock, like that, and it was somewhere around eleven o'clock, I don't remember just the minute. I reached down, that was the last. I felt the wire, or whatever it was, pull up on me, and I saw it was going to get my head, and I threw my arm up, where I showed you that mark, and that is the last I remember."

Corder was working at the time he was injured with a crew of men under the supervision of plaintiff's foreman. Before going upon the girder to paint he complained to the foreman that he thought it was dangerous and that the current ought to be turned off. The foreman assured him there was no danger and directed him to proceed with the work. One of the workmen refused to paint on that girder. He said he had a family to support and he didn't feel like he ought to go up there.

The cause was tried to a jury. The court sustained defendant's demurrer to the evidence and directed a verdict for defendant. The jury returned a verdict for

the defendant as directed by the court, and judgment was given accordingly. Plaintiff appeals.

The trial court took the view that under the contract of October 26, 1917, subsisting between the parties at the time Corder was injured, it was the duty of the plaintiff when it intended to paint or repair its bridge, to notify defendant of such intention and afford it an opportunity to have a representative in attendance to take such steps as might be necessary to secure the safety of the workmen engaged in such work, and that since no such notice was given or opportunity afforded defendant, and the plaintiff undertook to do this work without the co-operation or supervision of defendant as provided for in the eighth paragraph of the contract, plaintiff was not entitled to recover for the liability incurred and the moneys paid out by plaintiff on account of the injuries which its employee received while engaged in such work.

It is urged by plaintiff's counsel in argument that the third clause of the contract under decision is an absolute and final obligation to indemnify and hold harmless the bridge company from any possible damage or liability that may result to it from the presence of the defendant's wires on the bridge and that the absolute and final provisions of this paragraph for indemnity are in no way affected or qualified by the eighth paragraph of the contract. It is argued that the eighth paragraph does not require the bridge company to give any notice whatever of its intention to paint or repair the bridge, and that it throws no responsibility whatever upon the bridge company, but that, on the contrary, by its express terms, it throws an additional burden and responsibility upon the electric company, and that such additional burden and responsibility arises only in the event the bridge company should so desire or so elect and give notice to the electric company accordingly; that this paragraph was inserted primarily and solely for the benefit of the bridge company and therefore

means only that it confers an additional right upon the bridge company upon giving notice of its intention to paint or repair its bridge.

We cannot yield assent to this interpretation of the contract. It is manifest that the third and eighth paragraphs of the contract are mutually related and must be read and construed together. So reading and construing them we cannot become reconciled to the view that the provisions of the eighth paragraph for cooperation or supervision by the electric company to secure the safety of workmen engaged in the painting or repairing of the bridge was intended by the parties to the contract to be merely optional with the bridge company. The contract is not so written and we see no reason why it should be so construed. The contract does not say the electric company shall, *if* notice be given by the bridge company, or *if* the bridge company so request, or *if* the bridge company so desire or elect, arrange to have a representative in attendance to secure the safety of the workmen, but it says the electric company shall, *upon* notice by the bridge company, arrange to have a representative in attendance to secure the safety of the workmen. We do not agree with counsel that the provisions of this paragraph were inserted primarily and solely for the benefit of the bridge company. Under the contract the electric company was vitally concerned with the safety of the workmen engaged in painting or repairing the bridge, for under the provisions of the third paragraph of the contract the electric company agreed to indemnify the bridge company against any liability it might incur by reason of injury to such workmen. The language of the eighth paragraph gives express recognition and warning of the special danger and hazard to workmen engaged in painting or repairing the bridge from the presence of the electric company's wires on the bridge, for the express purpose of having a representative of the electric company in attendance was that he might instruct the workmen to keep a safe

distance between the wires and themselves. It is inconceivable that the electric company should agree to fully indemnify the bridge company against all liability for injuries to its workmen arising from such danger and at the same time take upon itself the further obligation or responsibility of providing for the safety of the workmen for the exclusive benefit of the bridge company. The reasonable construction of the contract is that it was the intention not merely to fix upon the electric company the obligation to arrange for the safety of the workmen, but also to confer upon it the right to do so; and so, we think, the contract reads.

The bridge company was not engaged in the business of handling, controlling, transmitting, and distributing electricity. Presumably its officers and employees were unskilled and untaught in that business. The electric company was engaged in that business. Its officers and agents were possessed of special knowledge and skill in handling, controlling, transmitting, and distributing electricity. They knew its dangers and knew how to avoid them. They were possessed of the equipment suitable for that purpose. They were in exclusive charge and control of the plant, equipment, and wires by which the currents were being transmitted over the bridge. In view of this, it would have been remarkable if the electric company had obligated itself to answer for injuries to workmen who might go upon the superstructure of the bridge amongst these deadly wires to paint or repair the bridge, without reserving the right to have its own representative in attendance to safeguard the workmen against the dangers from such wires. It is not surprising, therefore, that the parties agreed that, in the event the bridge company desired to paint its bridge, the electric company should, upon notice by the bridge company, arrange to have a representative in attendance for the purpose of instructing the workmen to maintain a safe distance between the wires and themselves.

That the agreement of the parties for the attendance of a representative of the electric company to look after the safety of the workmen was made for the benefit of the electric company, as well as for the benefit of the bridge company, there can be no question. This being true, it necessarily follows that it was not for the bridge company to say at its option that this agreement might be disregarded.

It will be observed that the contract further provides that the electric company, in the event that same becomes necessary, will at its own expense so adjust the wires on the bridge as to render the condition of the workmen of the bridge company reasonably safe from danger. Was it in the contemplation of the parties to this contract that if the safety of the workmen required that the wires be adjusted, the bridge company might ignore this agreement and undertake the work of painting the bridge without an adjustment of the wires, or undertake to adjust the wires itself, and then call upon the electric company to answer for the liability incurred by the bridge company on account of an injury to its employee while engaged in such work? Such an interpretation would be most unreasonable and out of harmony with both the letter and the spirit of the contract.

This is not purely an indemnity contract. It was not written by an insurance or indemnity company engaged in the business of writing indemnity contracts in consideration of premiums paid or to be paid as compensation for such indemnity. The main purpose of the contract was to grant and secure to the electric company the privilege of continuing the attachment and operation of its wires on the bridge, for a term of twelve years, for and in consideration of an agreed rental or compensation to be paid by the electric company to the bridge company. To this main purpose of the contract the provisions for indemnity were merely incidental. The third paragraph broadly provided for indemnity against liability on the part of the bridge company for injuries resulting from the presence of the wires on the

bridge. The wires against whose danger indemnity was provided were placed on the bridge in uninsulated condition. They carried a deadly voltage of electricity. They were extremely dangerous to persons who might go too near them, but were not ordinarily unsafe or dangerous to persons using the bridge for the purposes of travel. The language of the contract shows that the contracting parties had all this in mind and undertook, by inserting the eighth paragraph, to make special provision to guard against injuries to workmen who might be required to go near these wires in painting or repairing the bridge. The arrangement for guarding against injuries to such workmen was wisely left to the party that had control of the dangerous agency and knew how to protect the workmen against its dangers. The provisions of the third paragraph and those of the eighth paragraph of the contract are mutual and interdependent. The broad provisions of the one for indemnity are qualified and restricted by the specific provisions of the other dealing with an unusual and specially hazardous situation.

The plaintiff, in undertaking to paint its bridge, requiring its workmen to go upon the superstructure of the bridge amongst the defendant's uninsulated and dangerous wires, without notifying defendant of its intention to do so and affording it an opportunity to protect the workmen against the dangers thus incurred, violated an essential condition of the contract for indemnity, and, under the well settled law, such violation is a complete defense to the plaintiff's action.

But the plaintiff's counsel insist that its evidence shows that sufficient notice or knowledge of the painting of the bridge by plaintiff to meet the requirements of the contract was imparted to the defendant.

The evidence for the defendant upon this subject shows that at the time Corder was injured W. L. Jones was local manager for the defendant at St. Charles, and Stanley Stokes was superintendent of the outlying

plants for the defendant, and that neither of these representatives nor any of the officers or agents of the defendant were notified by the plaintiff or had any knowledge that the plaintiff was engaged in painting the bridge prior to Corder's injury. It was shown that Jones was a new manager at St. Charles, having been appointed to that position shortly before the commencement of the painting of the bridge.

The evidence for the plaintiff shows that shortly after the painting of the bridge was commenced and while the work was in progress the plaintiff's president, Charles D. Bolin, casually met the new local manager at a restaurant in St. Charles, being introduced to him by some citizen of that city; that the two gentlemen had lunch together, engaged in social conversation, and incidentally discussed a business matter. Concerning this Mr. Bolin testified:

"I told Mr. Jones that we were going to double the bridge toll houses, that the tolls had all been collected at the St. Charles side, that we were going to build a toll house on the east side, and we had no way to get light on the east side, and that I would like to have arrangements made for wires to run down to light the toll house on the east side. Mr. Jones said that those were high-power wires on the bridge and that the wire for the light would have to be run back across the bridge from St. Charles. He said it would be an expensive proposition to bring the light wire off from the high-power wires on the east side, and that he would get the necessary information from Mr. Stokes and take the matter up with me later. I told him we were painting the bridge and expected to paint the bridge from one end to the other. We walked out in front of the restaurant and I pointed to the painters painting the bridge and said that we were going to commence at this end and paint from one end to the other, and that I would like to get the wires put in on the east side in the toll house. He said to come back in a few days and he would let

216 M. A.—26

me know what could be done and what would be the cost. I went back afterwards and he told me it would be necessary to bring the wires from St. Charles back across the bridge. I said, 'Here are the workmen painting the bridge and we won't do anything about wiring until we are through painting the bridge, that we didn't want them stringing wires while the painters were working.' At the time I had these conversations with Mr. Jones I was not familiar with the contract in question and was not intending to give any notice under the contract. These conversations occurred some time before Corder was injured.''

Mr. Jones admitted conversations with Mr. Bolin in relation to lighting the toll house at the east end of the bridge but said these conversations occurred after Corder's injury.

It is this testimony of the plaintiff's president that counsel rely on in support of their insistence that defendant had sufficient notice and knowledge of the painting of the bridge to meet the requirements of the contract.

The law is well settled in this State and elsewhere that knowledge which comes to an officer or agent of a corporation through his private transactions, and beyond the range of his duties as such officer or agent is not notice to the corporation. The rule that notice to an officer or agent is notice to the corporation applies only where the matter with reference to which notice is given or acquired is within the scope of his authority and has some direct connection with his agency, and the notice or knowledge comes to, or is possessed by, him in his official or representative capacity, and where the officer or agent in the line of his duty ought, and could reasonably be expected, to act upon or communicate the knowledge to the corporation. [Kearney Bank v. Froman, 129 Mo. 427, l. c. 430, 31 S. W. 769; 14 A. Corpus Juris, sec. 2355D; 14 A Corpus Juris, sec. 2356; Williams & Pearson v. Dittenhoefer, 188 Mo. 134, l. c. 144, 86 S. W.

242; Corrigan v. Bobbs-Merrill Co., 228 N. Y. 58, 1. c. 69; Elgin v. United States, 253 Fed. 907, 1. c. 912; Griffith v. Royal Arcanum, 182 Mo. App. 644, 1. c. 656, 166 S. W. 324.]

Under these well-established principles it is clear that the evidence relied on is insufficient to show any such notice to the defendant corporation of the painting of the plaintiff's bridge as was required to meet the condition of the contract. The notice or knowledge which the defendant's local manager obtained concerning the painting of the bridge was not obtained in his official or representative capacity, nor within the scope of his authority, and was therefore not imputable to the corporation. The knowledge was obtained by him through mere casual remarks of the plaintiff's president while the parties were engaged in a discussion of a business proposition relating to a matter having not the remotest connection with the respective rights and obligations of the plaintiff and the defendant under the provisions of the contract in question. In the casual notice thus given to the defendant's local manager there was no suggestion or intimation that it was given under the contract or that any action was desired or expected to be taken thereunder. In fact the president conceded that the notice or information given by him was not intended as a notice under the contract. It does not appear that this local manager in the line of his duty as such ought to have communicated to his principal the knowledge he thus obtained, or that he could reasonably have been expected to do so.

Manifestly the case was rightly adjudged below, and the Commissioner recommends that the judgment be affirmed.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly affirmed. *Allen, P. J.,* and *Becker* and *Daues, JJ.,* concur.